## THE STATE OF KANSAS V. T. J. BASSNETT.

No. 16,087.

### SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*"Crime or Misdemeanor, Not Amounting to a Felony."* The "crime or misdemeanor, not amounting to a felony," mentioned in section 12 of chapter 31 of the act relating to crimes and punishments (Gen. Stat. 1901, § 1997), need not necessarily be independent of and separate from a homicide intended by such section to be reduced from murder to manslaughter in the first degree, but it may be involved in and constitute a part of such homicide.

2. ———— *Manslaughter — Attempt to Perpetrate an Assault.* Where a homicide is committed under such circumstances as would otherwise be murder, it may be reduced to manslaughter in the first degree if committed while attempting to perpetrate an assault or other crime or misdemeanor less than a felony upon the deceased.

3. PRACTICE, DISTRICT COURT—*Change of Venue.* A change of venue on account of the prejudice of the inhabitants of the county against the defendant should not be granted unless it is made to appear to the satisfaction of the court that the defendant can not have a fair trial in such county on account of such prejudice.

4. NEW TRIAL—*Misconduct of Juror—Finding of Trial Court*

The State v. Bassnett.

*Conclusive.* Where, upon a motion for a new trial, it is contended that a juror, after being impaneled to try the cause, made statements indicating that he entertained a decided and hostile opinion against one of the parties, which is denied, and the question is presented to the court upon the oral testimony of witnesses, and upon the hearing the court decides the question by denying the motion, such decision will be deemed final and conclusive here.

5. CRIMINAL LAW—*Instructions.* Instructions examined and sustained.

Appeal from Finney district court; WILLIAM H. THOMPSON, judge. Opinion filed June 5, 1909. Affirmed.

*Fred S. Jackson,* attorney-general, and *Edgar Roberts,* county attorney, for The State; *Orla H. Foster, Fred J. Evans,* and *Fred S. Dunn,* of counsel.

*M. W. Sutton, T. A. Scates, A. Hoskinson, W. R. Hopkins, R. W. Hoskinson,* and *R. J. Hopkins,* for the appellant.

The opinion of the court was delivered by

GRAVES, J.: On the 14th day of September, 1907, one W. H. Browning was shot and killed in Finney county. John T. Reed and the defendant, T. J. Bassnett, were jointly charged with murder in the first degree on account of such killing. They were tried separately. Reed was tried first and found guilty of murder in the second degree. The defendant was subsequently tried, and on February 27, 1908, was convicted of manslaughter in the first degree, and on March 28, 1908, was sentenced therefor by the district court of that county. From that sentence he appeals to this court. There are numerous assignments of error, but they are all covered by four principal objections, and, the argument of counsel in their briefs having been confined to these, none other will be considered here.

The first complaint made is that the court refused to

grant a change of venue. The petition for this application, omitting formal portions, reads:

"That in the above cause and court he is charged with murder by the state, jointly with one John T. Reed, who has been tried and convicted of murder in the second degree, in said county and court; that the people from whom the jurors were drawn in Finney county, Kansas, are so biased and prejudiced against defendant that he can not have a fair and impartial trial therein; that the cause of such prejudice and bias on the part of the said people is that there was tried in said court and said county two cases in which the charge was the same, the one of said cases was tried quite recently, and the defendants in said two cases were both acquitted; that the community at large believes they ought not to have been acquitted, and a great amount of talk was had about it, among the people, and an intense feeling grew in the vicinity that men charged as defendant is should be convicted, and affiant believes that Reed, his codefendant, was sacrificed to that feeling, and affiant believes that he will be also, if the case is tried in Finney county, and to avoid such injustice defendant asks that this court change the venue of this case to some court in said district where such prejudice does not exist."

To this petition was appended ninety-two signers, who made oath that they believed the statements of the petition to be true. The alleged homicide was committed in Garfield township, Finney county, and the petitioners were all residents of that township. They were secured by the defendant and a justice of the peace, who administered the oath to each. The defendant and one of the petitioners, J. A. Goodman, were cross-examined upon the hearing of the application. This cross-examination disclosed that the prior cases mentioned in the petition as having caused an intense feeling in the vicinity must have been cases which were tried several years before the application in this case was made, and that since that time material changes had been made in the population by the removal from the county of persons familiar with the circumstances surrounding the prosecutions and by the addition of

The State v. Bassnett.

new settlers in the county and township. Mr. Goodman had lived in Garfield township twenty-two years, and was not acquainted with the names of many of the petitioners or where they resided. There was no proof to sustain the facts involved in the conclusions of the petition; the showing failed to make a *prima facie* case, so far as Garfield township alone was concerned, further than the petition itself. The court, in denying the application, ordered that no jurors be taken out of this township. We are unable to see how this order refusing a change of venue was erroneous or prejudicial to the rights of the defendant. Section 177 of the criminal code requires that where proof is made by affidavits they must be to the satisfaction of the court, which they were not in this case. The statements in the petition were the merest conclusions, unsupported by any tangible facts. (*The State v. Parmenter*, 70 Kan. 513.)

The next question discussed is the alleged error of the court in overruling the defendant's challenges of jurors for cause, whereby his peremptory challenges were exhausted and he was unable to secure a fair and impartial jury. We have carefully read the examination of each juror to whom the challenge of the defendant for cause was overruled, and are unable to find that the court erred in any of such rulings. The one to which the defendant makes his strongest objection is that of juror F. W. Griggs, whose examination, so far as material, reads:

(*Examination by the state.*)

"Ques. Mr. Griggs, you reside here in the city? Ans. Yes, sir."

"Q. Mr. Griggs, have you ever heard this case discussed? A. Yes, sir.

"Q. In a general way or a casual way? A. In both ways, I suppose.

"Q. Did you ever talk with any one about it? A. Yes, sir.

"Q. From what you may have read did you form or express any opinion as to the guilt or innocence of the defendant? A. Well, I think I did."

"Q. From anything you might have heard, did the parties who were talking state any of the facts in the case? A. They were just simply speaking of the occurrence.

"Q. Was it relative to the case of The State against Bassnett or relative to the case of The State against Reed? A. Well, I think it was both.

"Q. Both? A. Yes, sir.

"Q. You read it in the newspapers? A. Yes, sir.

"Q. Mr. Griggs, from what you may have heard or read, did you form or express any opinion as to the guilt or innocence of the defendant, T. J. Bassnett? A. Well, I presume I did.

"Q. Is that such an opinion as it would require evidence to remove it? A. It certainly would; yes, sir.

"Q. Is it a fixed opinion or a slight opinion? A. Well, I never form a definite opinion in regard to anything until I hear all of it.

"Q. Then it is a slight opinion? A. Well, it might be that; yes, sir.

"Q. Then you have no fixed opinion at this time as to the guilt or innocence of the defendant, T. J. Bassnett? A. No, I think not.

"Q. Do you know of any reason at all, Mr. Griggs, if you were chosen to sit as a juror to try this case, why you should not render a fair and impartial verdict under the law and the evidence? A. I have no prejudice whatever.

"Q. If there was a killing, have you any opinion as to whether the killing was justifiable? A. I certainly couldn't have."

*(Examination by defendant.)*

"Q. You live here in town, Mr. Griggs? A. Yes, sir.

"Q. You were living here last September? A. Yes, sir.

"Q. You have heard what purported to be the facts in this case? A. Yes, I have heard the general run.

"Q. You read about it in the papers? A. Yes, sir.

"Q. You have an opinion in regard to the facts of the case? A. Well, in regard to what I have heard, I have an opinion; yes.

"Q. Well, anything you may have heard in regard to the matter, did you believe it? A. So far as I know.

"Q. Did you have any reason to disbelieve it? A. No, sir; not anything to the contrary.

"Q. Then, as a matter of fact, you did believe it? A. Well, I just take it for facts until I know it to be otherwise.

"Q. And you would believe it until the contrary was shown? A. Well, I naturally would; yes.

"Q. You read about it in the papers? A. Yes, sir.

"Q. And you remember about the trial in the district court of John T. Reed? A. I knew of the verdict. I was not in here and heard any of it. Of course I have read something of it; yes.

"Q. And so you have formed an opinion as to whether or not there was a killing had taken place? A. Yes, sir.

"Q. You formed an opinion as to whether Mr. Browning was killed? A. Yes, sir.

"Q. You formed an opinion as to where it was charged to have taken place? A. Yes, sir.

"Q. You formed an opinion as to how it was claimed he came to his death? A. Yes, sir.

"Q. You formed an opinion as to who it was claimed had killed Mr. Browning? A. Yes, I read the papers in regard to it.

"Q. Now, you have an opinion as to all of those facts? A. I have an opinion in regard to those facts from what I got from the papers and casual conversation with people.

"Q. Yes, and what you heard in regard to the facts? A. Yes, sir.

"Q. Now, that being the case, it would require evidence from the defendant to justify that alleged killing, wouldn't it? A. I would go according to the evidence.

"Q. It would require evidence by the defense in this case to remove those things from your mind as to the alleged killing of Mr. Browning? A. Well, to put it that way, I suppose it would.

"Q. Well, I don't want to take any advantage, Mr. Griggs, I simply want to get at your state of mind. A. Yes, sir.

"Q. It would require evidence from the defendant? A. As I heard the case, of course I have an opinion in regard to it.

"Q. And it would require evidence from the defendant to justify him, would it not? A. The evidence might change my opinion if it was to the contrary.

"Q. It could change? A. Yes, sir.

"Q. But it would require evidence, would it not? A. Certainly.

"Q. On the part of the defense? A. Certainly; I would go according to the evidence.

"Q. Well, perhaps you don't just catch my meaning. You have these opinions, and you have an opinion that there was a killing? A. Certainly.

"Q. You have an opinion that this defendant was concerned in that killing? A. Yes, sir.

"Q. Now, it would require evidence to your mind to convince you that he acted in any way justifiable, wouldn't it? A. Yes.

"Q. From the frame of mind that you are now in you would require that kind of evidence from the defendant or from the defense? A. Well, I believe it would; yes.

"Q. Well, aren't you certain it would, in your mind? A. Yes, I think so.

"Q. And then, Mr. Griggs, could you go in—enter into the trial of this case just in the same frame of mind as though you had never heard this matter talked about or never heard of it or never formed any opinion in regard to it? A. No, I suppose I couldn't hardly, but I believe I could be just as fair as a man that had never heard of it.

"Q. But, as a matter of fact, it would require testimony on the part of the defendant or his defense to justify anything that may have taken place, as you understand and know them at this time? A. Well, I think it would; yes, sir.

"Q. Well, isn't that a fact that it would? A. Well, I suppose, to put it that way, it would.

*(Further examination by the state.)*

"Q. Mr. Griggs, you say you have an opinion that there was a killing took place. Was that from what you might have read in the newspaper or heard talked or from your own personal observation? A. Well, just what I read of it, I suppose, or maybe I heard somebody say there was a killing.

"Q. Then you have no actual knowledge whatever of the killing, if there was one? A. Except what I have read and heard; not of my own knowledge; no.

"Q. Mr. Griggs, if the evidence showed that the killing of Browning was done by John T. Reed, and

that the defendant, Bassnett, was present, have you any opinion as to whether the killing of Browning was justifiable or not?  A.  No.

"Q.  I will ask you another question, Mr. Griggs: Have you any opinion as to—that if it should turn out in the case that the defendant killed W. H. Browning, have you any opinion now as to whether or not that was done in self-defense?  A.  None whatever; not a bit.

"Q.  From what you have read and heard about the case, I will ask you whether you have any bias or prejudice either for or against the defendant?  A.  I don't have any bias against anything until I hear it.

"Q.  Well, have you any for or against the defendant at all?  A.  Not a bit in this case.

"Q.  You feel that your mind is now open to a fair and impartial consideration of the testimony that may be introduced before you?  A.  Yes, sir.

"Q.  Then you can give the defendant a fair and impartial trial and render a verdict according to the law and the evidence?  A.  Yes, sir."

In connection with the answers of this juror it will be well to consider the facts upon which the accusation against the defendant depended.  Just before Browning was shot the defendant had in his possession the gun with which Reed did the shooting, giving it to Reed at his request.  It was contended by Reed that at the time the fatal shot was fired Browning was apparently drawing a revolver from his hip pocket, as if to shoot. Reed, therefore, upon his trial, claimed justification under the plea of self-defense.  This was also a part of the defendant's defense.  The state claimed that the defendant went to the place with intent to assist Reed in bringing on the encounter in which Browning was to be killed.  It will be seen from the examination of juror Griggs that he sustained no relations with the tragedy or trial which would bias or prejudice him in the least as a juror.  He must be judged, therefore, under the answers given, like any other citizen having the same knowledge and being in the same situation. He had heard the case talked about casually; he read

something in a general way about the commission of the homicide. It must be assumed that he was affected thereby as ordinary people are by what they incidentally hear or read about a crime. He does not appear to have been impressed sufficiently to state any fact that he heard talked about or that he saw in print; he does not seem to have heard any one talk who was or claimed to be in a position to know the facts discussed. Whatever impression he had was based upon the merest rumor, and yet he stated that he had an opinion as to the guilt or innocence of the defendant—an opinion which it would take evidence to remove. But upon more particular examination he stated that he had no fixed opinion—no prejudice; that he could try the case as freely and fairly as one who had never heard about the case. When he was interrogated about the specific facts upon which he entertained this opinion they proved to be the death of Browning, where and how he was killed, and that the defendant was concerned in the killing. These facts are all immaterial. They are all conceded by the defendant. When he was asked about his opinion as to whether or not Reed acted in self-defense, he had none; and when asked as to whether or not the defendant was jusfied in what he did, he entertained no opinion. Upon everything material in the case his mind was free from any bias or prejudice. The questions were adroitly put to the juror so as to make it appear that he had formed an opinion as to the facts of the case, but when those facts were specifically enumerated they proved to be immaterial because undisputed. It was conceded that the defendant handed to Reed the gun with which Browning was killed. The motive with which the defendant acted was the important question in the case, and upon that the juror had no opinion whatever. When the juror stated that he presumed he had an opinion as to the guilt or innocence of the defendant, it was after all the general talk he had heard and

read had been called to his mind, and when he evidently was impressed with the idea that such facts were material. Taking the whole examination of the juror together, we can not say that it was error to overrule this challenge, or, indeed, any of the challenges made. (*The State v. Wells,* 28 Kan. 321; *The State v. Gould,* 40 Kan. 258; *The State v. Treadwell,* 54 Kan. 507; *The State v. Morrison,* 67 Kan. 144.) We think these cases fully sustain the ruling of the court.

The next complaint made by the defendant is the refusal of the court to give instructions requested, which read:

"(1) You are instructed that it is made the duty of road-overseers under the law in their respective districts to notify each and all persons liable to pay a road tax of the time and place said persons shall appear and attend to do work upon any designated road, and said road-overseer may direct such person or persons to appear at such designated time and place and may notify such person what implements he shall bring, with which to perform such work, and it is the duty of said road-overseer to attend, direct and oversee such work.

"(2) And you are further instructed that if you believe from the testimony in this case that the defendant was so notified to appear by James A. Miller, the road-overseer of district No. 1 in Garfield township, on the 14th day of September, 1907, to appear at the place designated by said James A. Miller; and if you further believe from the evidence that the defendant attended in obedience to said summons, then the said defendant had a right to be at the place and at the time where said killing took place."

To see the force of these instructions it will be necessary to consider the facts of the case to which they relate: Reed, the defendant and others met at Browning's premises to work on a public road, claimed to be located through there, which claim Browning disputed. The defendant claimed to have been notified by the road officers to be there at that time and for that purpose, and that he was there in compliance with such notice.

26—80 KAN.

On the other hand, the state claimed that Reed and the defendant made use of the alleged road as an excuse for being there, expecting Browning to resist, in which case it was their intent to take his life. The whole point involved was, therefore, whether the defendant went there in good faith to work the road or in furtherance of a design previously formed with Reed to seek an opportunity to kill Browning. If the former, he was rightfully there; if the latter, he was there unlawfully. The instructions requested were therefore proper and pertinent, but were fully covered by the instructions of the court upon the same point, which read:

"Considerable testimony has been introduced tending to show that the place where the trouble in controversy occurred was a public road, or a strip of ground which was to be opened up as such, and that the defendant, in response to a call of the township officers, who, consisting of the township trustee, clerk, and treasurer, constitute the highway commissioners, and who under the law have charge and control of the roads and highways, went with others, including the road-overseer, for the purpose of laying out or working the road. What the facts are in this regard you are to determine from the evidence, and are to take into consideration only for the purpose of determining whether or not the defendant was in good faith in going to the place in question on this particular occasion and endeavoring to work the road at this point, and whether he was rightfully there, or, in other words, whether he was there for a legitimate and lawful purpose, as claimed by him, or for the mere purpose of making trouble with the deceased, as claimed by the state. In this connection, however, you are instructed that the question as to whether or not it was a public road or a legally laid out road, or as to whether or not the officers under whom the defendant claims to have worked were the legally constituted officers for such purpose, can make no difference whatever in this case on the material questions at issue; for even though the defendant went there without lawful authority, still if he in good faith believed it was a public road or a road which was or could be legally laid out, and in good faith went there honestly believing that he was acting under the proper

legal authorities, and believed he was legally there, his right to assist the said John T. Reed in the lawful defense of his person would not be impaired."

We think this instruction, in connection with others given, fully covers the point contained in those requested by the defendant, so that the jury were clearly informed upon this feature of the case. The rights of the defendant were fully protected in this respect. The fact that the court was not accurate in naming the officers whose duty it is to notify people to work the roads was immaterial.

Objection is specially made to the instruction given by the court which defines manslaughter in the first degree—the offense of which the defendant was found guilty. This instruction reads:

"If you acquit the defendant of the crime of murder in the second degree, you will then inquire whether or not he is guilty of manslaughter in the first degree, and in this connection you are instructed that if you find and believe, beyond a reasonable doubt, from all the evidence submitted to you, that the defendant, T. J. Bassnett, did, on or about the 14th day of September, 1907, at and within the county of Finney and state of Kansas, without a design to effect death, by his act, procurement or culpable negligence, while engaged in the perpetration or attempt to perpetrate any crime or misdemeanor, not amounting to a felony, in such manner and under such circumstances as would constitute murder at the common law, as I have hereinbefore defined the ·same to you, shoot and· kill, or encourage, aid or· assist another in shooting and killing, the said William H. Browning, in the manner as charged in the information, and that such killing was neither justifiable nor excusable under the rules of law hereinbefore given you, it will be your duty to find the defendant guilty of the crime of manslaughter in the first degree; but if you do not so find and believe it will be your duty to acquit him thereof."

The specific complaint is that the testimony does not justify the instruction, as there is nothing in the evidence, it is said, which shows that the defendant was

engaged in the perpetration of an offense less than a felony, as stated in the instruction and in the statutory definition of the crime of manslaughter in the first degree. This objection is founded upon the idea that the offense less than a felony contemplated by the statute must be something other than the crime with which the accused is charged. · While the state claims that it is immaterial whether such offense constitutes a part of the homicide or not, as applied to this case, it is contended by the state that it was not the intent of Reed to take the life of Browning when the fatal shot was fired, but that he only intended to stop the deceased from carrying out what his intentions appeared to be, which would be accomplished by an assault, or an assault and battery at most. The shot, however, caused Browning's death. In this view it is insisted that the offense intended must be regarded as the "crime or misdemeanor, not amounting to a felony," which was being perpetrated when the homicide occurred. There is evidence from which the jury might have reached this conclusion. Courts differ as to which of these views presents the true intent of the law. This question was presented to this court in the case of *The State v. Spendlove*, 47 Kan. 160, and it was there decided that the view herein taken by the state was correct. That case is still the law of this state, and is controlling here.

A further objection is made that after the jury had been in consultation for some time they were brought into court and given further instruction. The additional instruction is not criticized as being erroneous, but on the contrary it is conceded that the law given was correct. The objection seems to be that the same law had been substantially given before, and it was unnecessary to repeat the former instruction under a slight change of phraseology. The criticism is perhaps justified, but, while probably unnecessary, we are unable to see where or how the defendant was prejudiced thereby. We can not say that any error was committed by the court in this respect.

Railway Co. v. Baden.

Upon the hearing of the motion for a new trial an attempt was made to show that one of the jurors had upon his *voir dire* denied having any opinion as to the guilt or innocence of the defendant, and afterward made statements indicating that he held a very decided opinion hostile to the defendant. This was fully inquired into upon the testimony of several witnesses, and upon the whole examination the court exonerated the juror and denied the motion. The finding of the court concludes the question. (*The State v. Moore,* 79 Kan. 688.)

This constitutes all of the objections made, and, being unable to find that the court erred, the judgment is affirmed.